21-6391 Mr. Conlon for the appellant, or rather the petitioner. I understand, Mr. Conlon, you'd like to set one minute for rebuttal, is that right? That's correct, Your Honor. Okay, I think we're all ready. Whenever you're ready, sir. Thank you. Thank you, Your Honors. May it please the court, for the petitioner, We are challenging a decision by the Board of Immigration Appeals in which the agency found that the government had met its burden of proof in demonstrating that the petitioner had been convicted of an aggravated felony pursuant to the modified categorical approach, and the agency reached that conclusion by finding that the petitioner made sufficient admissions during his plea, which demonstrated which subsection of the Connecticut criminal statute he was convicted under to demonstrate that he's removable. Just to cut to the chase here, and I understand the number of arguments being on both sides, but would you agree that it would be determinative of the case if we were to agree with the government that we were allowed to consider the judge's recitation of the language of the particular subsection and then your client's confirmation that he understood it? If we were to agree that that was a permissible part of the colloquy for us to consider, would you agree that that would be dispositive? Again, I understand you reject the premise.  But if we were to disagree with your premise, would you agree that the government wins? We certainly agree that if the court finds that the petitioner admitted that the judge's statement of elements is what he was convicted of, that that is a removable aggravated felony. And that is the distinction. I think we all agree, but tell me if you don't, that we're not asking whether the defendant agreed that he, in fact, violated that subsection of the statute. The only question is whether he acknowledged that that was what he was being convicted of. Well, it's not an outward thing, so no one will believe it, but whatever. It's the same thing, right? He's not admitting that he did it. It seems very clear that he's not admitting a single thing. He's just saying, I get it, I'm being convicted, and I'm not fighting it. I admit nothing. In fact, I think he says something very explicitly along those lines. I didn't do it. He does. So would you agree? Let me phrase it a different way. If the judge had read that subsection before your client said I was guilty, would you agree it would be dispositive? So your argument is limited to the notion that he had already entered his plea and that everything that followed was not part of the plea. It was the sort of stuff that happened afterwards, and he could have moved to withdraw his plea, but he didn't. If the plea had already happened the moment he said I plead guilty and then everything afterwards is sort of detritus. I think that's part of it. One thing that I did want to point the court to, which I was reviewing the plea transcripts in anticipation of the hearing, would be page 132 of the record, where essentially, and this is a statement made by the judge right after this part of the hearing where he makes the statements tracking the elements and reads the petitioner's rights, and the way that I interpret this is the judge essentially says, now you understand, or the court understands that you don't agree with anything anyone just said because you made a no low plea, but we're accepting your plea anyway. I'm sorry, 132? Yeah, page 132. So it's lines 11 through 15 in the court. Now you understand you've said no low plea or no contest, which the way that I interpret that is the judge is saying to the defendant, I know you're saying that everything we just said you disagree with. But basically your argument is that Cherry does not apply  and here the statements which were made were made after the pleading, that there wasn't a statement by your client that he agreed with that. He didn't disagree, but he didn't agree in the way Moreno would seem to say is necessary, and that the question of whether in Connecticut you can narrow a charge after the plea is something that has never been argued and is by no means clear even could be done if it was done. That is correct, Your Honor. And certainly the agency never made a specific finding that the charge was narrowed and the court is reviewing the agency decision. So the agency never framed it that way. The agency said we think that the petitioner agreed with the judicial findings, not that the charge was narrowed.  Exactly, Your Honor. Mr. Conlon, if everything that came after the initial statement, I'm here to plead no love, is detritus, as Judge Nodini referred to it, doesn't that mean the whole plea is invalid? Because he entered his plea before he was told any of the things that he's required constitutionally to be told. All of the necessary instructions about here's what you're pleading to, you understand that? Here's what the consequences are. You understand that? Here are the rights that you're waiving. You understand that? All of it comes after he says I'm here to plead no love. Correct. So the consequence of what you're saying must be that this whole plea is unconstitutional. It would be wrong, fundamentally wrong, for a court to say, okay, you're pleading no love. Now I'm going to tell you all the things that you have to understand before you plead no love. Well, this is the way that I would understand it, Your Honor. The petitioner tenders his plea at the beginning of the hearing. Then the court, before the court accepts the plea, the court reviews the rights and says yes. The court establishes that he understands what the plea is. Correct. Item number one in establishing that he understands what the plea is, is this is the charge, which has not been previously stated. That's item number one of the court's explanation of what he needs to understand before his plea will be accepted. And his plea will not be accepted until he confirms that he understands all of these things. Isn't that what's going on in this proceeding? The one way I would respectfully push back, Your Honor, would be… No, no, I mean, what I'm asking you to do is explain how you push back. On page 126, you know, the clerk specifically says the information charges you with the crime of. So the clerk read the charge to the petitioner, and that's the charge that he pled to. And the rest of the hearing is the judge just explaining to him, I want to make sure that this plea complies with Connecticut law and the federal constitution. I want to make sure that you understand what it is that you're pleading to. And then he says what you are pleading to is sexual assault in the third degree. A person is guilty of sexual assault in the third degree when such person compels another person to submit to sexual contact by the use of force against such person or a third person. Do you understand? And he says… Well, the one thing, again, I would push back, Your Honor, is there's a lot that happens between that statement and do you understand. So the judge makes the statement that you just made. Then he stops and moves on to something totally different and reads through the rights that he's forfeited. Counsel, suppose at the end of the court's making these statements, the court had said, now this is what you are being charged with. Do you now plead guilty? That would be a very different case. But that, you are saying, that he's merely saying, you know, okay, is nowhere near anything of that sort. So how can we say that he pled guilty in any valid constitutional sense to something that he said after and there is some language. I would agree with that. And I think one thing I would point to would be that the Supreme Court has specifically emphasized that when non-citizen defendants make plea agreements with the state, that they know or make the plea agreement thinking about what the immigration consequences are. And we've gone back and forth so much about what this means. It's not really fair for a criminal defendant to be said, well, you understood that you were pleading to this. When you negotiated a specific plea agreement. Wait, wait. Where is there in the record any plea agreement, oral or written, that says here's what the terms of this plea are? Did I miss something? Well, there is no specific written plea agreement like there is in a federal case. Well, is there an oral plea agreement that is referenced by anyone that says these are the terms. We can have that and not have a federal court too. Excuse me. At the time of the plea, someone says we don't have a written plea agreement, but here are the promises that have been made on which this plea is based. Do we have anything like that? There is a statement that there was a plea agreement, and the record also shows that the petitioner was originally charged with a crime that clearly is an aggravated felony listing a specific subsection. And then there was a substitute information that was clearly a divisible statute with no subsection listed, made in the form of a plea that doesn't allow for review of what happened. Are there no other differences between the penalties for the thing that he was originally charged with and this statute? There are some penalties. This one is a lesser offense than the one that he was originally charged with, is it not? In terms of the prison sentence? Yes. Oh, yes, definitely. So why would we assume, particularly in light of the fact that the defendant was advised, do you understand that if you're not a citizen, this plea could result in deportation, exclusion, or denial of naturalization pursuant to the laws of the United States? No one says, no, whoa, whoa, whoa, wait, no. We specifically made a deal that this plea is being entered because that's wrong. Two things I would push back on. First, regarding the immigration, the Connecticut statute, the judge isn't supposed to say to the defendant, you will be deported, and the judge doesn't say that. The judge says there might be consequences. But the defendant is saying that because you never know what's going to happen. There are all sorts of discretionary waivers and prosecutorial discretion. You'll never say to someone, unless there's a stipulation, which is very rare, where a party stipulates and says I volunteer as part of the plea agreement to acquiesce to deportation. So that really doesn't tell us anything. What I was trying to get at is the defendant hears the judge say that, but he thinks in his mind, well, I already know I negotiated an agreement that's not deportable. What in the record says anything to suggest that that was the specific reason for the plea and that was a promise that was made and that's what happened? What you have is a person is pleading guilty to something that is a lesser offense, and he's got every opportunity through this whole colloquy to say, wait, no, I'm not pleading NOLO to sexual assault, meaning that I compelled someone to submit to sexual contact by use of force. That's not what the deal was. The lawyer doesn't say that. The client doesn't say that. No one says, judge, wait, there's a specific deal here that you have to understand. And so with all respect, judge, what you have to tell my client is he is pleading guilty to a generic violation of this entire subsection, which includes this and also includes incest, and that's what he's pleading NOLO to. No one says anything like that. Again, I understand, to tell Gracie's point and the point you're making, that that isn't or shouldn't be controlled, that it's not on him to object, but I am questioning how you can suggest persuasively that this was the deal when the entire plea sounds like that was not in anybody's mind and no one ever said, no wait, we have a deal. There are two things I'd point to. One would be that the original criminal information did list a specific subsection and the substitute information did not, and the only logical reason why that would happen would be immigration consequences. Why does it matter whether he made a specific deal or not? People don't do that. They may or may not. The question is, he pled to this. The court then says, along with a hundred other things in a confusing statement, situation after in which the clerk got things wrong and everything else, whether we say that somebody must be awake enough, understand enough, to say, oh no, that isn't what it was when he pled before with what was given to him before, so that that can be changed in a way that doesn't matter. The whole thing is absurd because the categorical approach is absurd. And the one thing I would say would be that the Supreme Court has said that this is essentially an objective standard and that it's assumed that non-citizen defendants are aware of the immigration consequences. That's what they said in St. Cyr. So that's why I agree with Judge Calabresi that we don't necessarily need to get into the defendant's subjective mind that it's an objective standard looking at it. What would a reasonable non-citizen defendant understand? So can I just ask this? I'm looking at page 131, and this is the plea. Yes. And I'm looking at line 8. This is the judge speaking. And he addresses the defendant and says, the statute you pled to reads as follows. And then he reads the subsection that's clearly a qualifying offense. So he doesn't say the statute, let me read a statute. He says the statute you pled to, right? And then he goes through the list of, he reads that, he reads the rights, as they do in every trial, right, in every plea, right? We don't have a, you've given up your right to remain silent, do you understand? To plead guilty, do you understand? We always, every judge at every plea colloquy goes through six or seven or eight things and then says, do you understand? And he says, do you understand that, sir? And the defendant says, yes, right? So I would think in any other circumstance, if we were reviewing the validity of a plea colloquy, for example, under Rule 11, we would interpret the do you understand that, yes, sir, to refer to all of the things that the district judge had just reviewed during the Rule 11 colloquy, correct? Yes, that is one. You would never say, well, you gave him a list of four things and then said you asked him do you understand. We're going to presume that he only understood the last one mentioned. So my question is when we apply that presumption to a federal plea or presumably on 2254 to the review of the validity of a state plea, why would we not apply the same interpretation to this colloquy to say that, yes, when he said the statute you pled to is, and that's the qualifying language, you understand that, to read as the defendant saying, yes, I understand that is the statute I pled to. Why is this now? Why are we offering a different interpretation of a plea colloquy than in any other circumstance we would ever have? Well, I would say two points on that, Your Honor. One would be that the pivot here is just so strong that he's going from reading a statute to then discussing the rights that he forfeited, and that's such a massive pivot that when you're going through the rule 11 colloquies where a judge will say here are the elements of your offense. There are three elements to a violation of 21 U.S.C. 841, one, two, three, you know, and then you're also giving up the right to remain silent. So if a judge doesn't break that all up with 16 do you understand's, we're now going to say that that was a big pivot? I would respectfully say that, even if Your Honor disagrees with me. Well, but I'm just saying, just to follow that through, if we're saying that, then we would also be saying that any rule 11 colloquy in federal court would be constitutionally invalid or at least invalid under the rules if we don't break it up with the do you understand's each time you pivot from the elements of the offense to the various trial rights being given, and that seems like a strong statement. I think it's a different, the way that sort of I would say that the court doesn't need to go that far. We're not arguing the plea is unconstitutional. We're saying that for purposes of establishing reusability under the modified categorical approach, we would say that that's a totally different analysis whether the plea is constitutionally invalid or not. Excuse me. Isn't the point that when the court says the statute you are pleading to is this, that is correct. That is the statute that he's pleading to. The question is, does the court, when it says that, say, and only that part of that statute is what you have pled to? Or can a person say that is a statute that you are pleading to? And sure, it gives the number of it, but it doesn't, the court didn't say you are pleading to that statute and only the first part of that statute. It refers to the statute. And the guy says perfectly understandably, yeah, that's the statute. That's exactly what I was going to say, Your Honor, that the judge never specifically says in the transcript, you are admitting that you were convicted under this subsection. The judge is just saying this is some of the language from the statute. Sure, that's true. I think we kept you up. I apologize for going way over. No, no, no, we kept you up here. And you have held a minute for rebuttal. We appreciate your answering our questions. Why don't we hear from the government? Ms. Shea. Whenever you're ready. May it please the court. My name is Jacqueline Shea. Be sure to speak into the mic quite clearly, please. I represent the Attorney General. I ask this court to come to the following two conclusions. One, this court's precedent, applying Shepard does not require defendants to explicitly confirm the facts. A narrowing is sufficient. And two, the petitioner's plea colloquy transcript reflects that the judge and the prosecutor narrowed the charge to only subsection A1. Can you do that in Connecticut? Can you narrow the charge after the plea? Your Honor, this court... What case do you cite me in Connecticut where a charge has been narrowed after the plea? Not in Connecticut, Your Honor. Well, in Savage, Your Honor. We're talking about Connecticut, so you have to give me a Connecticut case. Well, Your Honor, in this court's decision in Savage and in Moreno and also in this court's Albola-Ashkoff case. Those cases go to the fact that it may be that something is said to the plaintiffs, to the petitioner, sufficiently clearly so that he accepts it. And I have no doubt if the court had said clearly, you have pled guilty to section A, not section B. Do you agree with that? And he says, yes. Then there we are. The question is, have they done that or have they in some way exposed, narrowed the charge, which is what's the difference between this case and Cherry. Now, you know, the whole thing is absurd because the categorical approach is absurd, but there we are. Your Honor, respectfully, the judge here in this case clearly verbatim read from the statute. It read from the first part of the statute. That's not a question of Connecticut law, is it? We're not concerned with the question of Connecticut law, are we? No, Your Honor. We're concerned with the question of federal law, specifically with respect to how to deal with what I keep being told is the absurd categorical approach, right? I mean, that's what the question is. Yes, Your Honor. It's not about whether under Connecticut law, and indeed I find it hard to imagine how the judge couldn't in some sense under Connecticut law narrow the offense if at the end of the day the judge said, I'm going to throw the book at you because I can't stand incest. I think that's just horrible. And wait a minute. I never pled to incest. I was told I was pleading guilty to this other thing, and that's what it was. I mean, surely, you know, I don't know what it means to say under Connecticut law you can narrow the offense, but I would think the defendant would have a very good argument that I never pled to that part of the statute after this following. Well, Your Honor, Connecticut law is required to have a factual basis that is required for this plea, and it is also required that the judge personally see the petitioner and the defendant in court and make sure that he understands the consequences of his plea and that it was knowingly and voluntarily entered into. And the requirement for the petitioner... I want to continue a moment on what Judge Lynch said. That is, when the argument is made that the charge was narrowed, then we're getting into issues of Connecticut law, and as I think Judge Lynch said, that cannot be the issue. The issue has to be whether this person, under the Shepard rules which we have, has sufficiently clearly agreed that he had pled guilty to Section A rather than to the whole thing. And that's the question. The question is, does this colloquy suffice to say that he did that, or did he not? The notion that the charge could be changed gets into something that Judge Lynch said that's not really what we're about. Your Honor, Shepard provides that a plea colloquy transcript is a document that we can look to. It does not specifically provide... That was not a plea colloquy case, and it did not specifically say how we have to use a plea colloquy. Now, this court in Savage did provide two specific ways that we can use a plea colloquy transcript, and that was an Alford case, Savage. And one of the ways is that the defendant can... Some of us remember it all too well. Yes, Your Honor. And even distinguishing, Your Honor, from Moreno, from that case, we have more than Moreno in this case. We do not just have the prosecutor's factual basis. We have, additionally, the court, the judge here, narrowing the charge. Does it make any difference that it is the court's statement rather than the prosecutor's in terms of the question of whether the petitioner agrees that that is what it is? That is, if the question is, has the petitioner told us enough so that we know that under the modified categorical he has pled to something which is a violent crime, does it matter where the statement... It may matter whether it comes from the prosecutor or the court, but doesn't what matters most is the nature of the colloquy and what the guy says? Yes, sir, it does. Yes, Your Honor, it does. And specifically in Moreno, it was noted that there was no actual colloquy between the judge and the defendant, and there is one here. Additionally, in this case, Your Honor, the defendant was represented, and there was some times earlier in a pre-colloquy where he didn't maybe understand, and they stopped so he could confer with counsel. But it's pretty clear here, Your Honor, that he understood that that was what he was pleading to, and he said, yes, sir. And, of course, the difference, the critical difference between what the prosecutor says and what the judge says is that this is a no-no plea. And so the defendant is not acknowledging that he did the things that the prosecutor references. And for that matter, what the prosecutor is referencing is a factual basis. And he doesn't have to admit that he did any of those things. He's admitting that he's guilty of the charge that he's, what he's being charged with. And the judge told him what he was being charged with. So it's a very different thing than agreeing to the prosecutor. And he never agrees to what the prosecutor said. That's very explicit. Yes, Your Honor, I think acknowledging the words he used, Your Honor, was probably best in this case, that he acknowledged after that colloquy right there with the immigration, with the judge, he acknowledged that he was convicted of that subsection. But considering all the other evidence in this case as well, this was days... Let me ask again. Judge Nardini read, this is the statute to which you pled. And then he reads part of that statute. Now, for me, the key question is, when a judge does that, is it clear enough to someone that he's pleading, that he pled only to that, or is that a generic reference to, this is the statute to which he pled. And it is the statute to which he pled. He doesn't say, this is the section of the statute. He reads part of the section. Keeping in mind that the other half of the statute that he didn't read would involve whatever it was. Yes, yes. Which is a completely different thing in context. I think the question is in context. How would you read this? Then we're looking to what the guy actually did, which is essentially what we're not allowed to do. Well, let me ask you this, to sort of follow on the same question, maybe you can answer both. What do you make of, I know you wrote this in your brief, but on page 132, accepting that we cannot read the colloquy in any way, and the defendant admitting any of the facts. In fact, he denies them, expressly says, I didn't do these. But the court on page 132 at line 12 says, the court, based on the facts that were recited by the state's attorney, the court will make a finding of guilty, sir. Do you understand that? Is it your argument that even though the defendant in no way is admitting the truth of those facts, he is admitting that what he will be convicted of, that the court will make a finding, is the violation of that first section, the one that does not involve incest. So he doesn't have to agree that it happened, but he is agreeing that what is happening to me today is I'm being convicted based on the fact that the prosecutor recited, I'm going to be convicted of that, which only fits into the first subsection, which is the subsection that the court read out loud and said, do you understand that's what he pledged to me? He said, yes. Am I encapsulating or characterizing your argument correctly? Yes, Your Honor. I mean, basically, yes. There's actually nothing on the record to support incest. You need a factual basis for the plea. And what he did there was that he wasn't providing the factual basis. He didn't need to. He put a no low contendere plea in. But he was acknowledging that there was a factual basis. He was taking what the government put forward. And effectively, he was explicitly, he was confirming the factual basis of the charge as an explicit fact finding by the trial judge to which the defendant assented. And when you say confirming the factual basis for the charge, I don't understand you to be saying that he was agreeing with the fact that he was agreeing that the factual basis on which the court would be proceeding were those allegations. Correct. I actually understand your argument. Anything further? OK. Why don't we hear from Mr. Connelly. You have one minute. We kept you up for very long at the beginning. So why don't we keep it to a minute now? I'll be very fast. So to push back on what the government said, this court said in U.S. v. Moreno that judicial findings must be adopted by the defendant. So I think the same standard of you have to admit that they're true applies to both prosecutor statements and judicial statements. That's only if you want to hold the facts against the defendant as having truly happened, though. The second way that I'd push back on that point, Your Honor, would be that the court in Savage, which condolences, but the court said in Savage that you can't use that to determine the nature of the plea. And if the court does what the government wants and basically says, well, as long as the judge finds it, we don't care whether you admit it, well, then that means Savage gets thrown in the garbage. No, it does not. It does not put Savage in the garbage because Savage is a different case. Savage is a case in which the government was arguing that the facts were these because of the recitation. And that's not this case. This case is a question of what did he actually plead to. And the court twice explains what he is pleading to, first by describing what the statute is that he's pleading to and finding it quite precisely, leaving out the other part of the statute. And then by saying, and I'm going to make a finding that you did violate that statute that I talked about because I heard that from the prosecutor. You understand that that's what's happening here. Not you acknowledge that that's what you did or you acknowledge that those are the facts. That's completely different. Respectfully, that's not how the agency interpreted it. If you look at the BIA decision and the immigration judge decision, they said that we're finding removability based on findings of fact in the plea transcript. So if that's what the agency is saying. That page, just so we have it. Sure, so it. I don't have it right up to me. You're looking at page, was that three or four? One would be page four, which is the last full page. When it says the respondent, it's in the middle. Respondent did, in fact, explicitly confirm the factual basis for the plea. Thus, the immigration judge properly relied on the plea transcript. He also goes on, sir. Let me try to be clear on this. See, I have more problem than perhaps my fellow judges with the judge's explanation there. I do find the last point that Judge Nardini made of whether that is what you are pleading to. These are the facts I find. I find that harder to deal with from your point of view. Because it does look as though he is saying, not that you admit these facts, but that these are the facts on the basis of which I find you guilty. That may be there. But you're now making a different argument that that is not what the agency found. And so it is essentially a Chenery argument, which says that if the agency finds something that is erroneous in its own terms, we cannot find in its place simply because there would be enough evidence. Chenery says we have to send it back to the agency. Is that the argument you are now making? That's one of the arguments. And the reason why I raise Shepard, Your Honor, is because Connecticut law does require the judge to make a finding that there are sufficient facts before they can accept the guilty plea. So if the judge's acceptance of the facts is sufficient to allow the person to review it, then the whole point of looking at an awkward plea becomes irrelevant. Now I'm very puzzled. Because I obviously, if you argued this in your brief, I obviously totally missed it. I thought we were arguing exclusively about whether the plea colloquy clearly shows what the defendant pledged to. But it seems to me that this immigration law argument means it's a waste of time to talk about that. Because the Board of Immigration Appeals and the immigration judge made their conclusion based on what they attribute the facts to be. And that's not something you can do at all under the modified categorical approach. And so we don't need to look at the transcript any further. Because we just send it back to them and say, you got the law wrong. Can you show me where that argument was made in your brief? Because I didn't see it. And I sometimes miss things in briefs. I definitely did point to that language. I know I'm way over time. Maybe I could do a short letter to the court pointing it up. You don't have to answer it. You sure? Yeah, yeah, take a second. It's OK. We don't charge pleasantries here. Maybe some of the lawyers in this courtroom do. I do apologize. I don't want to waste the court's time. You can send us a follow-up. I can send a small letter pointing that out. That'd be perfect. If you want to do that, maybe by tomorrow. Tomorrow. It should just take me maybe half an hour. That's perfect. And let me just ask you, before you sit down, because we have turned our attention to the BIA decision, looking at page 4, the BIA quotes the immigration judge in two respects, as I read it. In that last, or I guess in the third paragraph on page 4 of the record, it's saying that the transcript shows that moments after the judge read the statutory language of the statute, the respondent explicitly confirmed the factual basis. It seems to me that the BIA relied on two things, as the IJ did. Number one, the reading of the statute. And number two, the respondent confirming the factual basis for the plea. Not confirming the accuracy of the facts, but confirming the factual basis, which we all agree there has to be. And as the defendant, even in an alpha or an oval plea, could contest and say, well, that's not an adequate factual basis. Even if you disagree with all the facts, you could say, again, if the court had said, well, I will find that the factual basis for the plea that you bought a lollipop. And then the defense lawyer would presumably pop up, or the defense lawyer would say, that's not an adequate basis for finding that I've violated a sexual offense statute. I don't admit it one way or the other, but it's not an adequate factual basis. It's different, and I think typically true during an alpha plea, that you will confirm that the factual basis is adequate, even though you deny it all. But you will admit that if true, it would satisfy the statute. That seems like standard alpha practice, no? Yes, but if that is enough to say you can look at what was said, then savage goes out the window, because that happens in every Connecticut case, so savage becomes an oval. That's a distinct argument from claiming that the BIA was relying on the purported accuracy of the facts, or suggesting that the petitioner here had admitted the truth of the facts. That's different from saying he confirmed the factual basis. Yes, there are two separate issues, Your Honor, yes. We appreciate both. Again, very well argued on both sides. We really do appreciate the very good presentation. We will take this case on submission. And yes, today or tomorrow, counsel, if you could just send us a brief letter, a couple lines, and any references to the brief. Thank you so much. And if the government feels the need to respond, I can't see why you would, but you can do that within 24 hours. All right, thank you very much. I appreciate both of you. We will turn to the third case, Cravoy v. Chaffeeus, 21-2934. And let's see, we have Mr. Langone for the appellant, is that correct? Yes, Your Honor. Am I saying that right? Yes, you are, Your Honor. And then we have Mr. Dennehy for the appellee. Correct. And Mr. Langone, I understand you would like to reserve two minutes for rebuttal. Yes, thank you, Judge. Why don't we get the clock teed up. There we go. Mr. Langone, you may proceed whenever you're ready. Yes, Your Honor. As may it please the court, I'm going to go to the harmless error analysis of this case. We had the district court and the state supreme court, appellate division, both make a determination that there were certainly a blatant, a brutal violation, and there was a Brady violation. I respectfully submit that I need to show this court the harmfulness of the errors in light of the notion that hard cases make bad law. This may seem a little technical, but on the Brady question, the question on harmless error, the question is whether there actually was a Brady violation because the Brady rule builds in an affirmative materiality requirement that the defendant to establish a Brady violation has to show, not just rebut some claim of harmless error where the burden is on the prosecutor, has to demonstrate that the information was material in the sense that it would likely have affected the verdict. Well, I think that those two concepts of harmlessness and materiality kind of dovetail. If I might just do a little bit of a presentation, because there were two cases that were joined in one trial mixed with another trial that was going on at the same time. It was a two jury situation. So I'd like to begin by stating to the court the deliberations in this case was three days. So right there, we know that this was not an overwhelming case. The jury was seriously deliberating. But the question before us is not whether we would find that. The question before us on each of the two things is whether New York was unreasonable in saying that this was not sufficiently important in the facts of the case so that it would have mattered. And for me, the problem in this case is that I might well think that what was said about the underlying major witness was important, or the same about the Bluton. But it's very difficult for me to say that in this case, New York was unreasonable in saying it wouldn't have mattered. That it wouldn't have mattered. Well, let me continue. And that's why, by the way, I think the potentially strongest argument is the argument about the combination of the two. Because there, New York has made no ruling. So while that's a difficult argument, at least as to the combination of the two, I'm not bound to say New York was unreasonable. There, if I bought your argument, I have problems with it. But the combination of the two, at least it's one where I can decide, rather than just say, is New York being unreasonable? Yes, and Mr. Wango, that's precisely why I asked the question that you did not answer. Which is, if there was no Brady violation, then there is no combination of errors to be assessed. Then there is only one error, the acknowledged error under Bruton, which was held by the state court to be harmless. So the allegations of this case, in terms of the Brady violation, we know that just as the trial was beginning, an attorney walked into the courtroom and had a sidebar conference with the judge, the state court judge who was getting ready to try this case, with the district attorney to quash the subpoena to have a witness testify. This witness, on two separate occasions, told the FBI, not the defense. She was never approached by the defense. They didn't know about it. The defense, ex-wife? Was she the ex-wife at the time or still wife? So what happens is... Just to be clear. Yes, sure. It's a good question here. So remember, this is a 1992 case. It's not tried until 2007. It's almost 14 years. So at the time of trial, were they married or not? At the time of the trial, they had long been divorced. Okay, that was my only question. I don't want to divert you from Judge Leach's question. I'm sorry. She had moved out of state and had changed her name. The defense was in prison for 10 years, I think, at that point. Had no contact with her. She had married, remarried, and she had children. She tells the FBI, on two separate occasions, when they go to her because they know this tennis bag is the central piece of evidence because it supposedly contains the murder weapons on two cases. And proving Creeboy's connection to these murder weapons  was important to establishing his involvement in the murder. It was corroboration of the alleged... to satisfy the accomplished corroboration rule according to the judge's jury instructions. So it was essential to get this into evidence. The tennis bag evidence was also the basis for a lot of the uncharged crimes that were admitted in this case that were supposedly admitted for the purposes of connecting Creeboy through dominion and control to those guns. The whole purpose here was to connect Creeboy to those guns. Wait a minute. So you're saying there was a whole lot of other evidence put in there to connect him to the guns? Uncharged crime evidence. That all comes in through the tennis bag. So in terms of the materiality of the bag that's not turned over, you want to know if it's Brady, if it's material. Well, that's coming in no matter what. That evidence is coming in. I understand you're saying there would have been impeachment evidence as to that. But the evidence about the bag still would have come in and all the other crimes evidence still would have come in. So it's not as though it had the impeachment evidence been turned over and none of that evidence would have been admissible. You're just saying there would have been a change in the mix of evidence on that point, right? There would have been a change in the mix. But all the corroborating evidence would have been untouched and not impeached by that particular piece of evidence, right? Well, let me say this. The relevance, the probative value of the uncharged crimes, again, was the connection to the gun, pre-bullying the gun. Right, and that would have come in and been unaffected. Had the judge known that the witness who supposedly gave that gun to Sarkisov twice denied that to the FBI who went to them on two separate occasions, who went to Holland on two separate occasions, that's a material consideration in terms of what you were going to allow in. Why? Well, because... I don't understand that. Well... It's separate evidence. It doesn't go to the credibility of any other witnesses on the corroborating information. The government still wants to prove the fact of the guns. The corroboration comes in or not. It would seem to me if there's going to be impeachment of the witness on that point, all the more reason to allow more of extrinsic evidence to come in to fight over the point. If I were trying that case and that happened to me, the first thing I would do is ask for an in limited hearing, immediately, on the truthfulness of the allegation. Because if, in fact... Why would the jury not get to decide the truthfulness of the allegation if you would impeach the person before the jury? I don't understand why the judge would make a preliminary determination. The judge isn't going to keep a witness off the stand on the theory that doesn't believe the currently proffered testimony on the basis that it will be subject to cross-examination. I don't understand that. Why would a judge keep that out? And then why would the judge then keep out what we would call 4.4.B information on the theory that some other witness is going to be impeached on another point? I don't understand that. I guess my point here is the law in New York is the opposite with respect to the federal system, with respect to each... I think you'd have to make a very difficult argument that the government would not introduce that evidence knowing of that impeachment of it and therefore nothing else would be. But that's a mighty difficult argument. You can't make the argument that the judge would. Especially given the fact that she would be... I would think that the government could easily attack the clearly exculpatory statements that she's making to the FBI. Exculpatory with respect to herself in the sense of trying to distance herself from the murder weapons. So you have sort of an easy line of redirect there. She's got all kinds of reasons to say this. Oh, I didn't know any of it. She could be a hostile superboy. Your Honor, I respect all of that. And that may very well be the truth. But why did he say he didn't turn it over, Ms. A.D.A. Blank? Two reasons. Number one, I didn't believe her. That's wrong, and clearly that's wrong. And then number two, she'd make a bad prosecution witness. Those aren't reasons to deny... And that she was a bad prosecution witness, and this is something I want to ask the other side about, is false as a reason. That's just a false reason. I think the statement that was later made by the prosecutor was she would be a bad prosecution witness because her demeanor was no good. She would be a bad prosecution witness because she would be a defense witness on this subject. So that I thought was a pretty outrageous thing for a prosecutor to say. On those points, I think that's clear where your argument is. I think that's why we're only talking about the materiality. The idea of not turning over evidence So I guess the thrust of my position with respect to the uncharged crimes is the judge has to weigh balance, the probity versus the prejudice, and limit the amount that comes in and weigh that. How much is the need for it as opposed to what you have? It just doesn't come in pell-mell. You have to weigh the balance. And in New York, the presumption is against admissibility. It's inadmissible. It's not the inclusionary approach of the Second Circuit. So the judge is a total mix of information. How do you know? They requested an order. They've got it sealed. The judge wouldn't even allow us to have the name of this person. And that goes to the second prong of Brady, which is whether it was suppressed, whether it was kept from the defense. I do not totally understand the second prong. Tell me something. Wouldn't I be allowed, when you have such purposeful, direct intentions to suppress, to keep this information from the court? They're hiding it from the court. They never told the judge about this. Look, I don't know, again, whether I would want to say that on the question of materiality, the degree of wrongdoing on the part of the government, and by the way, I'm inclined to agree with you that this was pretty darn bad on the part of the government. I'm inclined to agree with you. But I'm not sure that New York is unreasonable in not taking that into account. Unreasonable under the way the Supreme Court has defined it. In not taking that into account, I'm not sure. Considering that the second prong of Brady, which is suppression, is described as willful oriented burden. So it takes into account already suppression or failure to disclose can be willful oriented burden. Let's just do this. Let's turn to your adversary. You've reserved a few minutes, so we'll come back to you. Why don't we hear from the government? And I don't think it's any surprise. I think the first thing many of us up here would like to know is what on earth was the government doing, not turning that over on the theory that they didn't believe the witness. I think would the government agree that that's wholly inappropriate? Yes, Your Honor. May I please record Morgan Dennehy, officer of the Kings County District Attorney, for the respondent. I'm not here today, Your Honor, to defend the judgment of this prosecutor. Clearly, you should have turned this over. The policy of my office has been for a very, very long time that assistants aren't supposed to engage in materiality analysis. When there's evidence that's favorable to the defense, we turn it over, but the defense attorney chooses whether or not they want to use it and let it be vetted in front of the jury. Engaging in materiality analysis is a tricky business, and it runs counter to the spirit of doing justice as a prosecutor. So I'm not here to defend the conduct of the prosecutor in this case. However, what the prosecutor did in this case did not constitute a brevity violation for the materiality reason. There was no reasonable probability that had this statement by Alyssa Mayfeld been disclosed to the defense, the verdict in this case would have been different. Counsel, can you address the question of whether a brutal violation, which may not be unreasonable in terms of this, and a non-material, what would have been a brevity violation, taken together as facts, not as there is a brevity violation because there isn't a brevity violation for a reason Judge Lynch said, and they're brutal, which we may argue about, but whether that combination is so bad as a matter of facts in the case as to deprive this person of due process, because that's an issue on which we do not need to yield to your reasonableness. That's an issue which we can say taken this whole thing together, was this a fair trial? I think it's a tough thing for the other side, but I think it's the best argument in that. So your honor is referring to this cumulative effect of these two alleged errors claim that's being asserted. Without worrying about whether it is an actual found to be brevity because we have to follow New York and it isn't, but that doesn't keep us from asking whether the trial, I mean, one could conceive a situation in which there were enough of these things, but there is none of them, and we say, no, this trial can't stand. Well, the problem with the cumulative effect of the errors claim is that it presupposes the existence of two constitutional violations in this case. No, no. It presupposes that there were facts that went to constitutional violations, but which because of the state of the law, we cannot say was a constitutional violation, but that nonetheless together amount to something which makes it an unfair trial. I would argue that even if both of these alleged errors, well, one is not an alleged error, one is a written error, but the Brady error, which is for all the reasons I've stated, is not a Brady violation, but if the cumulative impact of this were to be analyzed, it still wouldn't afford the defendant relief in this case. I'm not going to belabor. This is a very long trial, over a month. It's a 4,000 page transcript. My problem is that the best thing for you is that these are two different murders. On the other hand, and that makes a different case, but both of these things go to the credibility ultimately of one major witness. That's right. And if the combination of things was enough to destroy the credibility of that witness, then we might be in a position to say that. Now, I'm not saying that they're supposed to do anything. That's their job to argue. But they haven't. But I'm asking you because that's what, if I were arguing the other side, I'd focus. Fair enough, Your Honor. So the witness in question is Sarkisov. And these two bits of evidence that the jury didn't hear, the Alyssa Mayfeld testimony about her denial of giving the tennis bag with the guns to Sarkisov, that's the Brady aspect. And the Bruton aspect is that the jury heard improperly a redacted version of the co-defendant statement, in which the co-defendant is talking about being present at the burning of the car in the second homicide. And if the court was even permitted, it somehow could contort itself to look at these errors cumulatively. The cumulative effect of these errors did not deprive the defendant of a fair trial and did not undermine the confidence in the verdict in this case because of the sheer quantity of corroborative evidence for Sarkisov's testimony. So these two bits of evidence, one, the Bruton violation, propping up marginally Sarkisov's credibility, and the other, Mayfeld's testimony, marginally chipping away at it, wouldn't have caused the jury to completely discredit Sarkisov because there were 10 separate instances, compelling instances in the testimony of other witnesses that corroborated aspects of Sarkisov's testimony so credibly that the jury understandably credited it and found the defendant guilty of these murders. The Bruton violation, it's worth mentioning, you did mention, I just want to emphasize, this was a redacted version of the statement. This was not a statement that was put into evidence saying something about Gravois. Gravois was not identified in the statement. Gravois was not identified in the statement. Now, I think we all agree that under Bruton that's not enough to allow this to be put into evidence. But it's a very minor piece of corroboration if it's taken only on a face value to say that this event occurred. Exactly, Your Honor. What all it amounts to. And in most of the homicidal context, this statement only pertains to one of the two homicides. And the prosecutor in a 134-page summation referred to it twice, very fleetingly, in about a page and a half. So it wasn't harped upon by the prosecutor. Well, there's a lot of other evidence, as you suggested, that puts Gravois at the scene of that murder. So this admission by Ivanitsky is not as... It's very minor. Minor corroboration, especially in light of the major corroboration. And I'm happy to recite the corroborative evidence from the case. Well, please do. That would help. I mean, it's helpful to have it. If you're going to argue, there's a lot of other stuff. I would love to talk about it. Yes, thank you. So Salkozov testified that before the Roitman murder, they test-fired the guns in Anton Veselov's apartment. And they put phone books against the wall, but the bullets went through the phone books and into the wall. And upon proctoring this information to the FBI, the FBI agents went to Veselov's apartment, took apart a piece of the wall, and lo and behold, there were bullets.  of Salkozov's testimony. Salkozov testified about obtaining these guns in a gym bag from the defendant's, at the time, wife, and using the guns and then returning them to Arthur Joubecki. Again, upon proctoring this information to the FBI, the FBI went to Joubecki's apartment and recovered this gym bag with these guns from Joubecki's wife. And one of the guns, the shotgun, the list of evidence matched up to a shotgun shell that was at the scene of the Roitman murder. So it was established that that shotgun in that tennis bat was the murder weapon in the Roitman case. In addition, there was testimony from a man named Michael Stern who sold that very same shotgun to the defendant's brother in the months before the Roitman murder. Salkozov's testimony was also corroborated by the testimony of the medical examiner, the testimony of two civilian witnesses who walked by and saw the burned-out car and testified about the location of the victim's body. That was consistent with what Salkozov described. The fire marshal testified about how that fire was started, also consistent with Salkozov's testimony. A witness, Nathan Gozman, testified that after the murder of Dieppe, he saw the defendant in possession of Dieppe's very distinctive fancy pool cue. And Gozman testified that the defendant admitted to him that he killed Roitman because Roitman was a snitch, which is the same motive that Salkozov attributed to the murder. There was testimony from another civilian witness who drove Roitman to a restaurant on the night of the murder and saw him getting into a car with a defendant. And he testified that Roitman told him, wait 30 minutes, I'll be right back. And he never returned. And finally, there was evidence of defendant's prison telephone calls in which he's being reprised that years after these murders in 1992, this is 2005, that Ivanitsky's been picked up by the police, he's being charged with murders committed in 1992, and that there's a snitch. And they're speculating about who the snitch is, and it's revealed that the snitch is probably Salkozov. And the defendant is dumbfounded and extremely upset by this information, which is consciousness of guilt information. And actually, the district court judge called these telephone calls alarmingly incriminating. So in light of all of this evidence that corroborated Salkozov, any minor impeachment from Mayfield would have been insignificant, especially considering that Mayfield had a strong motive to lie. And it was testimony regarding an ancillary matter, the transfer of the guns. I don't think the impeachment is minor. I do think the corroboration is there. Fair enough, Your Honor. I think we have your argument. Thank you very much. Thank you, Your Honor. Why don't we hear from counsel before the appellants. Mr. Longone, you have reserved two minutes for rebuttal. Thank you, Your Honor. I'd like to initially say that the best way to lie, as the Supreme Court has said, is to mix truth with lies. There's no doubt that Salkozov was involved in both of those murders. And there's no doubt that Guzman was with Salkozov for two months at NBC, where they spoke entirely in Russian and were figuring out how to get out of a bad situation together. The fact that their testimonies don't entirely dovetail is not necessarily proof of the independent truthfulness of either of them. I'd like to inform the court that there was a precipient eyewitness to this case, a precipient witness named Paul Carpati, and he had given the police a description of the suspects as two male Hispanics in a white car. A white car with a broken trunk was subsequently stopped. The individuals inside it, supposedly matched the description, were let go because they knew one of the officers. And no further investigation was done on that. Paul Carpati told the FBI that he saw the suspects carrying a double-barrel shotgun. Salkozov said that the shotgun... There was a security guard outside. He worked at a tennis club nearby and was walking by. And Salkozov testified it was a single-barrel shotgun. So there are issues with respect to that. Supposedly, Salkozov said he shot Reutemann. And Griezmann said that when he went to visit Creeboy in prison some years later, Creeboy said that he had shot Reutemann. So that is... My point is there that... And that's just with the Reutemann murder. Now, with respect to the Dieng-Deck murder, there was no corroboration of that. The only thing they had was Salkozov's testimony and there was Salkozov's testimony of the event. There were the so-called bumper tool markings that were on shell casings that suggested that they may have came from... The shell casing is found at the scene. They did bumper tool marking on it, and they were similar to a suggestive of coming from the same batch, perhaps, from some shells that were found at Grubetzky's house, apartment. It was never established, and we know that the... I think we're going to hold you to the truth. We understand your arguments, and we have the briefing, so thank you both very much. Thank you, Your Honor. Very helpful arguments. We appreciate it. We will take the case on submission. Thank you, Your Honor. Give me 10 seconds? Nope. Okay. Nice try, though. Thank you. Thank you very much. All right, and we'll take the last case on the calendar, 22-956, David Demarest versus Town of Underhill et al. Mr. Demarest, I understand you would like to reserve two minutes for rebuttal. Is that right? Yes, Your Honor. Thank you. Okay, I think we can set the clock appropriately, and feel free to start. And, again, if you want, you can raise or lower that podium switch on the right to whatever brings the microphone to a comfortable height. Thank you, Your Honor. May it please the Court. I, David Demarest, am representing myself due to the fact-dependent nature and extreme variation of conduct leading to the claims at issue today. When I built my home more than 20 years ago under a new dwelling permit issued to a 51.64-acre parcel on New Road, which is also known as High Road 26, no reasonable person could have ever predicted municipal defendants would willfully act both individually and in collusion to relentlessly and increasingly take from my bundle of clearly established property rights. If I may emphasize three points today, they will be, first, the proper legal framework to consider the motion to dismiss takings and associated due process claims after Nick corrected the error of Williamson County, and, second, the importance of a fair and feasible standard of review combined with genuine facts are required to apply claim preclusion to causative action presently before the Court. And, Mr. Demarest, if you wouldn't mind addressing... We know that this is one in a series of cases that have come before various courts, including, we understand, the Vermont Supreme Court. If you could take a minute during your presentation to explain why some of these cases, or some of these claims, are not precluded by virtue of the fact that there have been other cases decided before this one. Do you understand my point of Vermont law? Yes, thank you, Your Honor. In relation to claim preclusion, there is no nucleus of operative fact from prior claims and present claims because the Kafkaesque maze of administrative proceedings in both the reclassification and the road maintenance considerations, which were actually handled non-chronologically, were all deferential to municipal defendants' discretion. So they had to ratify the discretion of the defendants because the Vermont courts, due to the statutory construction of 19 VSA 701, subsection 2, as applied due to the catchment precedent, eliminated the district court non-deferential jurisdiction. But the Vermont court did hold that there was claim preclusion, and we have to follow them. Interestingly, there was a dissent, and the dissenter is in our court, but that makes no difference. We have to follow what the Vermont court said about claim preclusion. I agree, Your Honor. However, the critical detail that I need to emphasize is if you look at A200, towards the third paragraph from the bottom, quote, no fact-finding. So when it came to a Rule 75 deferential administrative appeal, there was a structural due process violation in that the municipal defendants were permitted to create their own record strategically to effect that taking over... Sir, your red light has come on, but since you're answering the question, why don't you keep talking for a minute? We will not deduct it from your two minutes. Just take an extra minute to answer Judge Kettlebury's question. Thank you, Your Honor. So the difference between ratifying and making an order, the reclassification only dealt with whether or not it was going to be classified as a road or as a trail, and the catch-em precedent is an error in saying that downgrading a road is not a taking. This issue cannot then have any merits before the Vermont courts, because as a matter of law, it was a deferential decision. And all of the prior claims involved that deferential discretion of the defendants, except for, I'll point out, the 2001 attempt to reclassify 10 Highway 26 was not valid, and that's on A193, and the County Road Commissioners, which actually found fully with the petitioners, of which I was a co-party, on A207. So the critical issue is the jurisdiction of the Vermont courts should be non-deferential involving claims which may, but not that they are, but that they may implicate a taking of private property rights. And Mr. Demarest, I have another question, which may not be ultimately germane because we're dealing with so many of these obstacles to the merits, but I did want to ask about the merits. The underlying takings claim is that, in effect, you have a property right to a well-maintained road because there was a well-maintained road there when you bought the property? No, Your Honor, there's different facts. I'd just like to understand, your ultimate claim here is a taking of an aspect of your property rights. And as I understand it, what we're fighting about is, in effect, an obligation on the part of the town to maintain a road because there was a road there all along. I'm just trying to understand that. So, may I proceed? Yeah, please go ahead and answer the question. So, thank you. So, there's a nuance there, and in relation to public road maintenance, it actually is within the record that the Class 3 segment, the municipal defendants received state money to maintain while refusing to do so. However, the claims at issue today are, one, the 19 VSA 717C statutory self-executing vested right of a landowner's access when a town highway is discontinued. And in the case of the reclassification, which is more properly termed a discontinuance as a town highway because a town highway, as a matter of Vermont law, is not... Sorry, a legal trail is not a town highway, according to Vermont law. And then the other thing is, if a discontinuance were to occur, the vested property right at the time the town highway was first laid out guaranteed a reversion in property interest where the property would cease to be public and it would be both the private right of way for abutters and it would be the right of the property owners to exclude and exercise all the benefits of ownership from that former town highway.